Michael W. Graf (SBN 136172)
Law Offices
227 Behrens Street
El Cerrito, California 94530
(510) 525-1208
mwgraf@aol.com

Brian A. Ertz (ISB 9960), *applicant pro hac vice*
Ertz Law PLLC
380 S 4th Street, Ste. 104
Boise, Idaho 83702
(208) 918-1663
brian@ertzlaw.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EARTH ISLAND INSTITUTE; TULE RIVER CONSERVANCY; and SEQUOIA FORESTKEEPER,<br><br>Plaintiffs,<br>v.<br>U.S. FOREST SERVICE and U.S. FISH AND WILDLIFE SERVICE,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I. INTRODUCTION

1. Plaintiffs John Muir Project of Earth Island Institute ("John Muir Project"), Tule River Conservancy ("Tule River Conservancy"), and Sequoia ForestKeeper challenge ongoing implementation actions, and inactions, related to three logging and vegetation management projects in the Giant Sequoia National Monument ("Monument") and the Sequoia National Forest ("SNF"). Activities in the Monument are governed by the 2012 Monument Plan, which the Forest Service acknowledges was only intended to be used for 10-15 years, and was not written to address management of large wildfire areas.

2. On August 19, 2020 lightning ignited a wildfire within the Sequoia National Forest on 129,218 acres, which burned through ten (10) giant sequoia groves within the Western Divide and Kern River Ranger Districts ("Castle Fire"). On September 9, 2021, a second wildfire burned 75,384 acres through all or portions of nine (9) giant sequoia groves (”Windy Fire”). All of the burned sequoia groves were in the Giant Sequoia National Monument, home to federally listed or proposed for listing wildlife species including California spotted owl, Southern Sierra Nevada Fisher ("Fisher") and California condor (referred to also as ‘Listed Species’).

3. Following the Castle and Windy Fires the Forest Service responded by approving the Castle Fire Ecological Restoration Project ("Castle Project") and the Windy Fire Ecological Restoration Project ("Windy Project"), each proposing sustained logging and clearing of the post-fire landscape to remove burned vegetation, purportedly to prevent future fires.

4. The Forest Service conducted environmental review for the Projects under the National Environmental Policy Act (NEPA) through environmental assessments (EA), each of which

assumed that the areas subject to the fires had been rendered as unsuitable habitat for the owl, fisher and condor. The EAs also assumed that natural giant sequoia regeneration would not occur in the high intensity burn patches. Based on these assumptions, the Forest Service determined that the project activities were not likely to have a significant impact to the environment and that no Environmental Impact Statement (EIS) was required.

5. The Forest Service's assumptions that the burned forest provided no suitable habitat for the named ESA listed species led to its decision not to engage in consultation under the Endangered Species Act (ESA) with the US Fish and Wildlife Service (FWS) about potential impacts to the California condor. Further, based on the EA's assumptions, the FWS determined that the Projects were unlikely to have an adverse effect on the Fisher.

6. On July 16, 2026, the Forest Service approved a third project in the burned area of the Monument, the Starvation Creek Grove Hazardous Fuels Reduction Project ("Starvation Creek Grove Project"), which was categorically excluded from NEPA review. The Starvation Creek Grove Project authorizes the Forest Service to log standing trees and clear remaining vegetation within the Giant Sequoia National Monument that had been previously excluded from the Windy Project. The Starvation Creek Grove Project relies on a Categorical Exemption finding under NEPA, based on the same assumption made in the EAs that the post-fire early seral habitat in the Monument has no habitat value for the Condor, Fisher and spotted owl.

7. Since authorization of the Castle and Windy Projects, and prior to authorization of the Starvation Creek Grove Project, new information has invalidated the Forest Service's assumptions and highlighted that early seral habitat--the habitat that initially re-emerges post-

fire--has significant value to wildlife including to the ESA listed California condor and Fisher and to the proposed listed California spotted owl, each of which species the Forest Service wrongly assumed would avoid mid and high severity burn areas. This new information shows that these Listed Species are actively utilizing the post-burn project areas at a high rate, contrary to the assumption in the Projects' EAs and Categorical Exclusion.

8. In addition, new information shows that giant sequoia regeneration is abundant in high severity burn areas, contrary to the Defendants' assumptions that such natural regeneration would not occur.

9. Since decisions authorizing each of the three projects were issued Plaintiffs have notified the Forest Service of significant new circumstances and information that counters these incorrect assumptions and demonstrates how continuing implementation of the Castle and Windy Projects, and more recently the Starvation Creek Grove Project, are likely to have significant adverse environmental impacts that were not examined in the Projects' EAs, FONSIs, and Finding of No Extraordinary Circumstances including, but not limited to: a) abundant giant sequoia regeneration in early seral habitat created by higher-severity fire areas; b) California spotted owl nesting sites not previously acknowledged within project areas; c) frequent and widespread utilization of post-fire early seral habitat by Fisher; and d) frequent and widespread utilization of post-fire early seral habitat by California condor.

10. Plaintiffs bring this action to require the Forest Service to conduct supplemental NEPA review for the Castle Project, the Windy Project and the Starvation Creek Grove Project, and the 2012 Giant Sequoia National Monument Plan, based on the new information showing that giant sequoia regeneration and the named Listed Species are being harmed by the Projects and

to require the Forest Service and FWS to reinitiate ESA consultation for the Fisher and initiate consultation for the California Condor, which are likely being adversely affected by the ongoing logging that is occurring. Plaintiffs also seek to require the Forest Service to comply with forest plan provisions. Plaintiffs also seek injunctive relief to prohibit further logging in the Giant Sequoia National Monument pursuant to these Project approvals until the Forest Service and FWS have complied with federal law.

## II. JURISDICTION AND VENUE

11. This lawsuit alleges violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 et seq.; the Endangered Species Act, 16 U.S.C. §§ 1531 et seq.; the National Forest Management Act, 16 U.S.C. §§ 1600 et seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court may issue declaratory relief pursuant to 28 U.S.C. § 2201, and issue injunctive relief pursuant to 28 U.S.C. § 2202, 5 U.S.C.§ 705, 5 U.S.C. § 706(1), and 5 U.S.C. § 706(2)(A) & (D).

12. An actual, justiciable controversy now exists between Plaintiffs and Defendants. The requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-06.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the affected public lands and resources are located in this judicial district.

14. Plaintiffs have exhausted all required administrative remedies prior to this action.

15. The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

**III. PARTIES**

16. Plaintiff Earth Island Institute ("EII") is a 501(c)(3) nonprofit corporation organized under the laws of the State of California. EII is headquartered in Berkeley, California. EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment. Through education and activism, these projects promote the conservation, preservation and restoration of the Earth. One of these projects is the John Muir Project, headquartered in Ridgecrest, California. The John Muir Project's mission is to protect all federal public forestlands from commercial exploitation that undermines and compromises science-based ecological management. EII is a membership organization with over 15,000 members in the U.S., over 3,000 of whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes. EII through its John Muir Project has a longstanding interest in protection of national forests. EII's John Muir Project and EII members actively participate in governmental decision-making processes with respect to National Forest lands in California and rely on information provided through the NEPA processes to increase the effectiveness of their participation.

17. Plaintiff Tule River Conservancy ("Tule River Conservancy") is a California nonprofit conservation organization dedicated to protecting the Sequoia National Forest and the Giant Sequoia National Monument.

18. Plaintiff Sequoia ForestKeeper is a 501(c)(3) nonprofit corporation organized under the laws of the State of California and based in Rohnert Park, California. The mission of Sequoia ForestKeeper is to protect and restore the ecosystems of the southern Sierra Nevada - including both the Sequoia National Forest and the Giant Sequoia National Monument - through monitoring, enforcement, education, and litigation.

19. Plaintiffs' members include individuals who regularly use and continue to use public lands within the Southern Sierra Nevada National Forests, including the exact tracts of lands in the Project areas proposed for logging, in particular, for scientific study, recreational enjoyment, aesthetic beauty, and nature photography. These members' interests would be irreparably harmed by the planned and continued logging, as they would no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

20. Defendant United States Forest Service is an agency or instrumentality of the United States, within the U.S. Department of Agriculture. The Forest Service is vested with the authority and duty to manage and protect the public lands and resources of the Sequoia National Forest, including the Giant Sequoia National Monument, at issue here.

21. Defendant U.S. Fish and Wildlife Service (FWS) is an agency or instrumentality of the United States, within the U.S. Department of Interior, which is responsible for administering the consultation provisions of the ESA with regard to threatened and endangered species, including the federally endangered Fisher and California condor, at issue here.

22. Defendants' violations of law, as alleged herein, injure the aesthetic, commercial, conservation, scientific, recreational, educational, wildlife preservation, procedural and/or other interests of Plaintiffs and their staff, supporters, and members. These are actual, concrete injuries caused by Defendants' violations of law, and the judicial relief sought would remedy, in whole or in part, Plaintiffs' injuries.

## IV. BACKGROUND

### A. Giant Sequoia National Monument Management Plan

23. The Giant Sequoia National Monument was established in 2000 to protect Giant sequoia groves and associated ecosystems and habitats from "more than a half century of logging that resulted in the virtual removal of most forest in some areas of the monument." 65 Fed. Reg. 24097 (April 25, 2000).

24. To protect the unique resources of the National Monument, the Forest Service prepared the Giant Sequoia National Monument Management Plan ("Monument Plan"). The Monument Plan states that the Monument holds a diverse array of scientific and historic resources, in which “magnificent groves of towering giant sequoias, the world's largest trees, are interspersed within a great belt of coniferous forest, jeweled with mountain meadows.”

25. The Monument Plan states that the giant sequoia groves and their surrounding ecosystems in the Monument provide a context for understanding ongoing environmental changes. and an opportunity to understand the “consequences of different approaches to forest restoration.” The Monument is “rich in rare plants and is home to more than 200 plant species endemic to the southern Sierra Nevada mountain range…This spectrum of interconnected

vegetation types provides essential habitat for wildlife, ranging from large, charismatic animals to less visible and less familiar forms of life."

26. To accomplish these goals, the Monument Plan calls for monitoring to assess the status of giant sequoia populations within designated giant sequoia groves and populations within the Monument but outside of the designated groves, to assess sapling recruitment, density, and survival. The Monument Plan calls for 'Effectiveness Monitoring' to assess project performance measures of occupancy and habitat conditions for wildlife protection to assess whether management strategies being implemented are providing for the protection of wildlife habitat. Such 'Effectiveness Monitoring for wildlife occupancy and habitat should occur within 5 years of the Monument Plan Record of Decision (ROD), as new scientific information becomes available.

27. The Monument Plan also requires ongoing 'Status and Trend' monitoring to assess the status of fisher and California spotted owl populations in the Monument, including project-level surveys and annual monitoring.

28. The Monument Plan also requires "[s]ite specific documentation" of impacts to threatened, endangered, or proposed species in the Monument "for all individual projects carried out under this programmatic direction."

29. The Monument Plan contains Vegetation Standards and Guidelines ("Vegetation S&Gs"), which require that a finding of "clear need" prior to the removal of trees in the Monument and that all conifer trees with a diameter of 20 inches or greater be retained in westside forest types. The Vegetation S&Gs require the Forest Service to save viable existing

reproduction of Giant sequoia seedlings and saplings where feasible and restrict mechanical entry and vegetation management within grove administrative boundaries.

30. The Monument Plan also contains Wildlife and Plant Habitat Standards and Guidelines ("Wildlife S&G"), which require the Forest Service to maintain a limited operating period (LOP), prohibiting activities within approximately 1/4 mile of the spotted owl nest site during the breeding season (March 1 through August 15) unless surveys confirm that California spotted owls are not nesting.

**B. National Monument Biological Resources at Risk Due to Projects.**

*1) California Condor*

31. The California condor is listed as an endangered species under the Endangered Species Act. As of 2025 there exist 607 California condor left in the world. 392 California condor remain in the wild of which 216 remain in the California wild (99 in southern California and 117 in Central California).

32. California condors occur in the Monument and have been documented actively using the areas planned for logging and tree cutting and piling, or where such activities are ongoing currently. California Condors rely upon large snags, mostly pine and fir snags, for roosting sites. Felling or removal of such snags will "impact" Condors. Giant sequoias are the only known trees large enough to provide nesting cavities for the condor, which otherwise must nest on cliff faces. The last pair of condors breeding in the wild was discovered in a giant sequoia that is part of the Monument. California condor roosting and nesting sites are susceptible to disturbance and “require isolation from human intrusion.”

33. The Monument Plan requires the Forest Service to protect California condor according to the direction set forth in the FWS California Condor Recovery Plan, which is to ensure the recovery of the condor by protecting roosting and potential nesting sites, including in historic use areas such as the Starvation Grove Historic Nest Site and the Lion Ridge roost area. Specifically with respect to the Starvation Creek Grove Nest Site, the Monument Plan provides that "[n]o habitat modification (including reduction in the vegetative cover) will be allowed within one-half mile of the historic nest tree" and that "management activities within the California condor nest management area but beyond the one-half mile restriction will be designed to protect and/or enhance habitat in the area for condors."

34. The California Condor Recovery Plan provides guidelines for management of nest and roost sites. The Recovery Plan calls for managers to "protect known and potential [Condor] roost sites from activities that could adversely modify or destroy them," and also requires "preservation" of associated Condor foraging habitat indicated by radio elemetry detection locations.

35. The 1988 Sequoia National Forest Plan designated the Starvation Grove nest area and Lion Ridge roost area, which are within the Monument, as areas of critical importance to condor roosting and nesting. The Monument Plan programmatic environmental review assumed managers would prohibit habitat modification within a one-half mile radius of the Starvation Grove Historic Condor Nest Tree. The Monument Plan also requires managers to "[c]ontribute to the recovery of the California condor by protecting roosting sites and potential nesting sites."

*

*2) Fisher*

36. The Fisher (*Pekania pennanti*) is a medium-sized, blackish brown mammal belonging to the weasel family (Mustelidae) that is found primarily in conifer and mixed hardwood forests, with populations distributed across parts of California, Oregon, and Washington. Fishers are obligate users of tree or snag cavities for denning, and they select denning and resting sites with a high proportion of characteristics associated with late-successional forests, such as snags, down wood, and vertical and horizontal diversity.

37. The FWS identified the 'Southern Sierra Nevada Distinct Population Segment (DPS) of Fisher as endangered under the ESA on June 15, 2020. 85 FR 29532. The Southern Sierra Nevada DPS of fisher (southern Sierra Nevada fisher) is one of two DPSs on the west coast of North America and represents the southern-most population, which occurs from the Tuolumne River in Yosemite National Park south through the forested lands abutting the Kern River Canyon.

38. On September 30, 2025 the FWS published its 5-Year Review of the Southern Sierra Nevada Distinct Population Segment of Fisher. ("Fisher 5-Year Review"). The Fisher 5-Year Review was the first such review for the southern Sierra Nevada fisher, updating the science and information on Fisher since the 2020 final listing rule that listed the Fisher as endangered. U.S. Fish and Wildlife Service. 2020. Endangered Species Status for Southern Sierra Nevada Distinct Population Segment of Fisher. Federal Register 85: 66987-67006. The 5-Year Review found that "the Sequoia and Kings Canyon National Parks [Fisher] subpopulation has remained relatively stable over the years, with minimal variation, despite substantial habitat loss from recent wildfires."

39. FWS has acknowledged that Fisher make use of mid-severity burn habitats, and even more severe burns where habitat structure remained (i.e. snags, standing-dead tree forests). A recent 2025 study show that Fisher select for live forests and selected against open areas, regardless of availability, and were found to use patches of standing-dead tree forests within established territories, which may act as corridors between patches of live-tree forests. However, the study also found that "fishers selected live forest similarly regardless of availability, but also selected stands affected by tree mortality", while avoiding ‘open’ areas, such as those resulting from salvage logging (felling or removal of standing dead trees in snag forest patches).

40. The Monument Plan states that the mid-elevation forests of the Monument are dominated by large conifers arrayed in a complex landscape mosaic, providing “one of the last refugia for the Pacific fisher in California” and that the fisher appears to have been extirpated from the northern Sierra Nevada mountain range. The Castle Project BA notes that the current southern Sierra Nevada fisher population almost certainly numbers <500 total individuals and probably <300 adult fishers.

*3) California Spotted Owl*

41. California spotted owls are occur in California, and Nevada including the Sierra Nevada, coastal California, and southern California, and are continuously distributed throughout the forests of the western side of the Sierra Nevada. Owls nest in areas of mature, multistoried forests with complex structure, larger trees, multi-layered high canopy cover, and large amounts of coarse woody debris, while areas with higher heterogeneity of forest types and the areas between them are important for foraging. Breeding season begins in mid-February, and the juvenile dependency period can last through mid-September. Spotted owls

typically have only one nest per breeding season, and they rarely re-nest if the first nests fails. California spotted owls in Yosemite National Park had territory centers with average values of 40 percent canopy cover in burned forests. The biological and physical components that create habitat heterogeneity and complex structure include patches of burned habitat, and large diameter standing dead trees (snags) and downed logs, and some open areas within a California spotted owl's home range.

42. The 1988 Sequoia National Forest Land and Resource Management Plan ("SNF Plan") requires the establishment of California Spotted Owl Protected Activity Centers ("PACs").

43. In 2012, the Monument Plan relied upon provisions of the 2004 Sierra Nevada Framework Forest Plan that assumed that "the distribution of California spotted owl populations in the Sierra Nevada is stable." Accordingly, the Monument Plan assumed that standards and guidelines that "would allow short-term reductions in [California spotted owl] habitat quality by removing trees, snags and down woody material," were nonetheless "not likely to result in a trend toward Federal listing or loss of viability of California spotted owls."

44. At the time that the Monument Plan was implemented, the FWS believed that uncertainty about the population status of California spotted owl, and uncertainty about threats to spotted owls, prevented its finding that listing of California spotted owl was warranted by the then-available best information--or, more precisely, the lack of information prevented listing. The FWS also believed that management provisions designed to mitigate impacts of logging and mechanical thinning on owls--i.e. those developed pursuant to the 2004 Sierra Nevada Framework--were adequate to prevent a declining trend toward extinction.

45. However, since then, the FWS has determined that the owl's populations are clearly declining and continue to decline, that the 2004 Framework Forest Plan's provisions are not adequate to prevent the owl from being driven to extinction, and that ESA listing is now necessary, biologically, to prevent the extinction of the California spotted owl, based on new scientific information. Accordingly, on February 23, 2023, FWS determined that a listing of 'threatened' under the ESA was warranted for the Sierra Nevada Distinct Population Segment of California spotted owl. (88 Fed. Reg. 11600 (February 23, 2023)). The FWS determination acknowledges serious harm to spotted owls from mechanical thinning and post-fire logging.

*4) Giant Sequoia Regeneration*

46. The programmatic EIS for the Monument Plan makes the assumption that the appropriate and natural fire regime for giant sequoia groves is "Low-moderate" intensity and severity, with "Surface to passive crown" fire. The Monument Plan EIS acknowledged that giant sequoias need wildfire to effectively reproduce and that the "almost non-existent" lack of reproduction is a major threat to giant sequoia populations, but assumed that low/moderate-intensity prescribed fires, which include occasional high-intensity fire patches "an acre" in size, or "less than one acre," would be sufficient to facilitate effective giant sequoia reproduction over time. At the same time the Monument Plan EIS assumed that high-intensity fire is a primary threat to giant sequoia populations and so must be prevented. However, the Monument Plan FEIS also acknowledged that the giant sequoia groves in the Monument had been deprived of fire for "a century" and so information on their response to different levels of fire intensity was incomplete. Nevertheless, the Monument Plan EIS chose as its preferred alternative one based mainly on logging and other forms of tree cutting and removal based on

the concern that long-unburned groves would experience mostly high-intensity fire which could prevent successful regeneration.

47. Since 2012, the scientific landscape regarding giant sequoia reproduction and fire has changed profoundly due to large fires that have recently occurred in the Giant sequoia grove areas and adjacent forests in the Monument. While these fires have been mostly of low to moderate-intensity, they have also included significant patches of high-intensity fire. Post-fire studies have shown that, contrary to the Monument Plan EIS assumptions, giant sequoia regeneration is in fact vigorous and abundant in areas in the Monument that have recently burned at high intensity.

**C. Castle and Windy Fires and Approval of Salvage Logging Projects in Response**

48. On August 19, 2020 lightning ignited a wildfire within the Sequoia National Forest, eventually burning 129,218 acres of National Forest System lands within the Western Divide and Kern River Ranger Districts (Castle Fire). The Castle Fire burned through all or portions of ten (10) Giant sequoia groves and influenced the vegetation and habitat patterns of wildlife species including the Listed Species.

49. On September 9, 2021 lightning ignited a wildfire within the Tule River Indian Reservation, which spread into the Giant Sequoia National Monument and the Sequoia National Forest, eventually burning 75,384 acres of National Forest System lands ("Windy Fire") before being extinguished on December 14, 2021. The Windy Fire burned through all or portions of nine (9) giant sequoia groves and influenced the vegetation habitat and patterns of wildlife species including the Listed Species.

50. Following the Castle and Windy Fires the US Forest Service responded by proposing "fuels reduction" activities and undertook the preparation of environmental review to support its proposals for more sustained and aggressive post-fire management activities, the purported purpose of which was to further remove fuels to prevent future high-intensity fires.

51. On December 28, 2023, the US Forest Service authorized the Castle Fire Ecological Restoration Project ("Castle Project") and the Windy Fire Restoration Project ("Windy Project") (jointly "Castle and Windy Projects") after its preparation of environmental assessments and respective Finding of No Significant Impact for both projects. Combined, the Castle and Windy Projects allow felling and removal of trees, including commercial logging, within over 50,000 acres of public forestland, mostly located within the Giant Sequoia National Monument.

52. On April 22, 2024 the Sierra Club, Earth Island Institute, and Sequoia ForestKeeper filed suit against the United States Forest Service challenging the Castle and Windy Projects for multiple violations of NEPA, including its unlawfully narrow Purpose and Need statements, its failure to prepare an Environmental Impact Statement, for violation of NFMA, and for its violation of the Endangered Species Act given the presence of a pack of gray wolves. *See Sierra Club et al v. US Forest Service*, (ED Cal Case 1:24-at-00337). This action remains pending.

53. On July 16, 2026 Defendant Forest Service issued its Finding of Applicability and No Extraordinary Circumstances for the Starvation Creek Grove Hazardous Fuels Reduction Project ("Starvation Creek Grove Project"), categorically excluding the new 142 acre project, located within the designated Starvation Creek Grove-seated within the Windy Fire area. The

Starvation Creek Grove Project authorizes the Forest Service to fell, masticate, destroy trees, and spread the resulting wood-chips within the Giant Sequoia National Monument grove administration boundary that had been previously excluded from the Windy Project. The Starvation Creek Grove Project was authorized without public comment or notice despite the ongoing litigation challenging the Windy and Castle Projects.

### D. New Information and Changed Circumstances Show that the Projects Could Have Significant but Unaddressed Adverse Effects on Listed Species and Natural Sequoia Regeneration

54. The Windy Project and Castle Project environmental review made a number of material assumptions bearing on the "significance" of likely environmental impacts of their proposed actions, which new information discovered since the approvals show was unfounded. These reviews in the form of EAs assumed that in areas designated as "high severity" (or "high intensity") fire patches, there would be little or no natural sequoia regeneration, nor would there be meaningful potential for natural sequoia regeneration. Further, the EAs assumed that the forest and habitats designated as moderate and high intensity burn areas were--and would continue to be--unsuitable for California condor, California spotted owl, and Fisher, and that the areas would not be utilized by these species.

55. In addition, the categorically excluded Starvation Creek Grove Project utilizes specialist report materials prepared for the Windy Project in March 2023 that are based on these same no longer valid assumptions and so do not acknowledge that habitat value of the post-fire early seral habitat in the Monument for the Condor, Fisher and spotted owl.

56. The new information and circumstances arising since the Castle and Windy Project's approval show that the assumptions in these past environmental review documents are

unwarranted and invalid. In particular, further monitoring and surveys, including those conducted by state and federal agencies, have documented substantial utilization of the Project areas by California condor, California spotted owl and Fisher, all within the Project areas designated as high intensity burn areas. Such use of these high burn areas by these Listed Species was not anticipated in the Projects' environmental review documents, which instead assumed incorrectly that these areas did not offer suitable habitat to these species. This substantial information has all been discovered since the review and approval of the Castle and Windy Projects.

57. Since approval of authorization of the Castle and Windy Projects California condors have been abundantly documented within the area, contrary to the Forest Service's assumption that condors would not visit or make use of the habitats within the Projects' areas that had severely burned. The U.S. Geological Survey's California condor tracking database documents that between 2022 through 2025, post-fire California condor detections occurred in, and adjacent to, every giant sequoia grove in which the Forest Service plans to carry out logging and other intensive tree cutting and piling pursuant to the Projects' authorizations, A total of 87 California condors have used the Starvation Creek Grove and Deer Creek Grove combined, and 63 condors have used the Deer Creek Grove alone since the Windy Fire occurred. Post-fire condor detections also occurred in and adjacent to Freeman Creek Grove, Belknap Complex Grove, Alder Creek Grove, and Mountain Home Grove in the Castle Fire. These high concentrations of condor detections in and adjacent to these groves, and especially in high-severity fire areas (which are targeted for post-fire logging and activities), indicate consistent, active, frequent use, active roost sites, and potentially nesting sites in areas that are being logged or planned for future logging.

58. Similarly, the Project EAs identify mid and high severity burn class habitats as being "lost" to Fisher utilization and recovery potential, thereby denying that the areas constitute suitable habitat for Fisher. The Forest Service determined that most Fisher reproductive habitat had been destroyed by the fire, thus it assumed that it was unsuitable Fisher habitat and of little conservation value. The Biological Assessments for the Windy Projects contains the same flawed assumption that the burned habitat is unsuitable and therefore provides no habitat for Fisher.

59. The Forest Service's assumption that the burned areas leading to early seral habitat is not suitable Fisher habitat is contrary to the mitigation required by the Monument Plan and identified but not adopted in the EAs, to provide shrub cover and standing dead tree cover in post-fire projects in order to "address bottlenecks in habitat connectivity that burned." *See* WL-17 (Habitat fragmentation affecting old forest associated species.)

60. With respect to California spotted owl, the Projects' environmental review documents assumes management will comport with the Standards and Guidelines of the Monument Plan, which includes required surveys prior to project implementation to detect nesting, perching, or roosting owls within 0.25 mile of project activities. Such surveying is to comply with the Monument Plan's prohibition on activities within approximately ¼ mile of the nest site during the breeding season (March 1 through August 15). However, subsequent monitoring has shown that Project logging and clearing has occurred within this .25 mile buffer.

61. In addition, monitoring conducted since the Castle and Windy Fires has demonstrated Forest Service's use of prohibited mechanical equipment in areas where substantial giant sequoia seedling and sapling recruitment is occurring.

62. Similarly, significant recruitment of thousands of giant sequoia seedling and saplings have been documented where none were anticipated—in high intensity burn areas targeted for project activities. Specifically, the Project EAs made determinations that monitoring in 2021 and 2022 had found limited areas of natural giant sequoia regeneration in high-intensity fire patches and that seedling survival in high severity burn areas had no sprouting seedlings and that no viable seed source remains.

63. Despite this questionable finding the Project environmental review documents still assumed that if giant sequoia seedlings were found in any management unit, they would be protected from harm during project implementation. Specifically the Castle Project EA assumed that if and where regenerating giant sequoia were found, mechanical ground-based machinery would not be used. The Castle Project EA insisted that protecting sequoia seedlings would be prioritized for management.

64. The Sequoia National Forest has not complied with this management direction to protect giant sequoia seedlings during management activities. Instead, the Forest Service has used ground-based machinery to fell and pile snags in low, moderate, and high severity fires areas within and immediately adjacent to the sequoia groves where naturally regenerating giant sequoia seedlings are abundant. Monitoring has shown that thousands of giant sequoia seedlings across the Monument landscape have been trampled, crushed, damaged, and broken by the ground-based machinery, with the greatest losses occurring near stacks and piles of snags. Thousands of giant sequoia seedlings and saplings have been cut and added to the piles to be incinerated in the pile burns, and thousands more have been crushed and killed as Forest Service field crews have piled thousands of pounds of cut snags on top of giant sequoia seedlings and saplings.

65. The Forest Service's own FACTS database, its GIS data, of management activities has documented use of ground-based machinery in areas the Forest Service's review documents had committed would not be used, where significant density of giant sequoia seedlings were naturally germinating and regenerating, throughout implementation of the Projects thus far.

66. In sum, since its decision documents authoring the challenged projects the Forest Service has made substantial changes to its implementation of the Castle and Windy Projects as compared to the authorizations and project design assumptions considered in its environmental review documents, which have resulted in: a) substantial numbers of naturally regenerating and viable giant sequoia seedlings and saplings being cut and killed by the tens of thousands through project activities; b) harmful Project activities in the immediate vicinity to now known and identified California spotted owl nest(s); c) harmful Project activities in the immediate vicinity and through known and identified Fisher den and foraging habitats; d) harmful project activities in the immediate vicinity to and within giant sequoia groves where endangered Condors are known to actively forage and roost, particularly in early seral habitat created by higher-severity fire patches; e) logging of snags over 35 inches despite the EA's assumptions that this would not occur except for documented 'hazard trees.'.

67. As a result of the flawed assumptions in the Forest Service's environmental review documents for these Projects, there is risk of significant harm to the Listed Species as well as natural giant sequoia regeneration that has not been addressed under NEPA. California Condor rely on the carcasses of mule deer and other medium-sized and large vertebrates as important food sources. Such carcasses are significantly more abundant in early seral habitat created by higher-severity fire areas than in unburned forests or low-severity fire areas. In addition, early seral habitat contains a much higher occurrence of small prey species, which is

also critical for spotted owl and Fisher, which are known to prefer these habitats for foraging. Early seral habitat is characterized by an abundance of snags, downed logs, and high-nutrient fire-adapted species like montane chaparral (highly utilized by mule deer), all habitat components the Forest Service targets for removal with the Projects.

**E. ESA Consultation with FWS is Inadequate for California Condor and Fisher**

68. The Windy and Castle Projects did not initiate ESA consultation with FWS regarding potential adverse impacts of the Starvation Creek Grove, Castle and Windy projects on the California Condor, for which the environmental review documents made a "no effect" finding. The ‘no effect’ determination was based on the reasoning that “there is a lack of suitable habitat within the area or that the species are found outside of the occupied range." This determination did not and does not account for the fact that recent monitoring has shown that the condor are using the project areas, and preferentially utilizing the intensely burned areas of the Projects and thus are likely to be adversely affected by the salvage logging and tree felling and piling activities.

69. The Forest Service conducted informal consultation with FWS regarding potential impacts to Fishers from the Starvation Creek Grove, Castle and Windy projects, but assumed incorrectly that such impacts would be minimal because Fisher would not be using the burned areas. Based on this flawed assumption, the Forest Service and FWS thereby allowed the projects to move forward with a finding and FWS concurrence, that the projects may affect Fishers but are not likely to adversely affect this endangered species despite removal or degradation of early seral habitat that is utilized by Fisher.

**F. Forest Service and FWS Reject Plaintiffs' Request for Supplemental NEPA and ESA Review Based on New Information Showing Potential for Harm.**

70. On May 26, 2026 Plaintiffs notified the Forest Service that the Projects' were not being implemented according to the descriptions in the environmental review documents as well as the presence and regeneration of high levels of giant sequoia seedlings and saplings, which the Forest Service had assumed would not occur and were neither disclosed nor analyzed in the Projects' EAs. Plaintiffs notified the Forest Service of recent studies showing that: a) giant sequoia regeneration was much denser and faster-growing in high-severity fire areas than in low/moderate-severity areas; b) post-fire tree removal conducted with ground-based machinery killed 83% of the natural post-fire giant sequoia regeneration; c) giant sequoias can effectively reproduce only after high-intensity fire and that managing exclusively for lower-intensity fire leads to regeneration failure and will not maintain viable sequoia populations; c) natural sequoia regeneration in the largest high-intensity fire patch was considerably denser than the agency scientists had assumed; d) the density of surviving large sequoias within the largest high-intensity fire patch was nearly three times higher than government agency scientists assumed; and that and e) tree planting by the Forest Service in high-severity fire patches shifted species composition significantly away from, and to the disadvantage of, giant sequoias.

71. On June 28, 2026 Plaintiffs again put the Forest Service on notice of the new information and changed circumstances with respect to giant sequoia regeneration in the high burn areas, as well as the potential impacts to the Listed Species, which were utilizing and even preferring the burned forest habitat that the Project environmental review and decision documents had assumed would be unsuitable, despite the natural creation of post-fire early seral habitat providing significant benefits to these species.

72. On June 28, 2026 Plaintiffs also notified the Forest Service of the location of a California spotted owl nest, requested cessation of project activities in immediate vicinity to the nest, and requested supplemental environmental analysis. However, on July 15, 2026 Plaintiffs observed, and documented, crews felling trees and engaged in disruptive and harmful Project activities closer than ¼ mile from the California spotted owl nest tree about which Plaintiffs had notified the Forest Service.

73. The Forest Service has declined to respond to Plaintiffs' requests for confirmation that the Forest Service has surveyed for owls; have not abstained from engaging in project activities within ¼ miles of California spotted owl nesting, perching, or roosting sites; and have not updated PACs or LOPs for discrete documented sitings of California spotted owl.

74. On July 21, 2026 Plaintiffs again put Defendants on notice of the Condors' significant use and occupancy of the project areas based on the government's own data and requested immediate cessation of project activities within proximity to condor and likely roosts and nesting sites. In addition, Plaintiffs put the Defendants on 60-day notice of Plaintiffs' intent to sue due to Defendants' violations of the ESA due to its failure to consult adequately with FWS on the condor and Fisher.

75. On multiple occasions throughout August 2026, Plaintiffs documented that the Forest Service had begun logging the Starvation Grove Historic Nest Site, including within one-half mile radius of the historic nest tree in the Nest Site area, a violation of the Monument Plan and a significant impact to California condor. On August 9, 2026 Plaintiff Tule River Conservancy confirmed that the Forest Service was actively logging merely a few hundred meters away from the historic nest tree within the Starvation Grove Historic Nest Site.

76. On August 26, 2026 Sequoia ForestKeeper documented and provided the Forest Service notice of the same active logging in the Starvation Creek Grove, including felling of large snags--potential condor roost trees--within the Grove, and less than half a mile from the historic Starvation Creek Grove Condor nest tree, and the use of heavy, ground-based logging machinery in this same area to create logging skid trails several hundred feet into the interior of the Grove, thereby also crushing and killing giant sequoia seedlings and saplings.

77. On September 17, 2026 three experts in the demography and population health of California condor who have published a combined more than one dozen papers on California condor ecology and conservation in collaboration with members of the California Condor Recovery Program, leveraging a combined 75 years of expertise, sent correspondence to the Forest Service expressing concern that ongoing and authorized Project activities including disturbance and destruction of frequently used forest sites within the project areas will impact and compound problems facing the critically endangered southern California condor flock, which comprises about one quarter of the global wild population of California condors.

78. The Forest Service has not responded to Plaintiffs' request to cease project activities in proximity to condor roost and nesting sites, disclosed the aforementioned information to the public, conducted an EA for the Starvation Creek Grove Project or supplemental EAs for the Castle and Windy Projects, prepared an EIS, or a supplemental Plan EIS, nor otherwise responded to Plaintiffs' notices in light of this significant new information. Nor is there any information indicating that the Forest Service has taken steps to "[p]rotect roosting and potential nesting sites."

79. Neither the US Fish and Wildlife Service nor the US Forest Service has responded to Plaintiffs' 60-day notice of intent to sue to enforce the Endangered Species Act on behalf of California condor. Plaintiffs ESA claims are thus ripe.

80. The Forest Service has still not consulted with the U.S. Fish and Wildlife Service about impacts of the Projects to endangered Condors. Nor did the Forest Service change project implementation in light of the new information regarding Condors. The Forest Service and FWS have not reinitiated programmatic consultation, nor otherwise modified programmatic consultations, on the California condor Biological Opinion(s), governing programmatic Forest Service actions, including implementation of the projects, to incorporate the new and best information.

81. The Forest Service has declined to supplement its environmental review of the Projects or Plan despite the significant new information regarding giant sequoia regeneration and Listed species' active use of in the Project areas and despite Plaintiffs' ongoing attempts to notify the Forest Service that its implementation of Project activities have substantially deviated from commitments assumed in its reviews.

**FIRST CLAIM FOR RELIEF**
**Violations of NEPA**

82. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

83. The Forest Service Defendants' violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., by approving or continuing to implement the Projects and the Plan based on the legally and scientifically inadequate EAs and FONSIs. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

84. NEPA is our basic national charter for protection of the environment. One of NEPA's fundamental goals is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321.

85. NEPA requires agencies to take a "hard look" at the effects of agency actions and analyze "reasonably foreseeable environmental effects of the proposed action." 42 U.S.C. 4332.

86. NEPA obligates the agency to make available to the public high-quality information, including accurate scientific analyses, expert agency comments, and public comments before decisions are made and actions are taken. To take the required "hard look" at a proposed action's effects, an agency may not rely on incorrect assumptions or data. Scientific integrity and data reliability requirements are found in the NEPA statute, requiring agencies to "make use of reliable data and resources" and also "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document", 42 U.S.C. 4332, including in EAs. 42 U.S.C. 4336e(5).

87. An agency that has prepared a NEPA analysis has a continuing duty to take a hard look at a proposed action even after it has given its initial approval. As a part of that duty, when the Forest Service considers supplemental NEPA analyses for project activities, including commercial timber sales and "fuels" reduction activities, the agency is required to consider and respond to public comments regarding the environmental effects of these activities. The Forest Service failed to meaningfully consider or respond to comments submitted by Plaintiffs and other members of the public by ignoring submissions of new information and requests,

providing evasive and dilatory responses, and by failing to notify Plaintiffs of new agency actions.

88. A supplemental analysis is required under NEPA if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. Further, NEPA requires agencies to reevaluate within five years “the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid." 42 U.S.C. 4336b.

89. The Forest Service is on notice of the significant new information and circumstances showing the likely significant impacts of the Projects to California condor, California spotted owl, Fisher, and to the prevalence and success of naturally regenerating giant sequoia seedlings and saplings within high-intensity burn areas, which were neither considered nor contemplated in the prior environmental review documents. The Forest Service's decisions and determinations in this respect are based on outdated assumptions and no longer valid science and are thus incorrect, arbitrary, capricious, and not in accordance with law.

90. Additionally, the Forest Service's July 16, 2026 Finding of Applicability and No Extraordinary Circumstances authorizing the Starvation Creek Grove Project is arbitrary, capricious, and otherwise violates the law in that: a) forest management activities authorized by the categorically excluded project includes actions not permitted by the adopted category or categories in the authority the Forest cites in its decision notice; b) extraordinary circumstances exist that precluded the use of a categorical exclusion, including species and critical habitats as alleged above; and c) the authorization amounts to impermissible segmentation of analysis.

91. The Forest Service unlawfully segmented its environmental review into three discrete reviews of three related projects: the Castle Project, the Windy Project, and just recently the Starvation Creek Grove Project. The Forest Service's segmentation of the Projects avoids analysis of potential significant environmental impacts and avoids the "hard look" at the effects of the Forest Service's overall post-fire response as required by NEPA.

92. The Forest Service Defendants violated NEPA by its continued reliance on faulty assumptions in its NEPA analysis and by its decision refusing to supplement the that analysis despite significant new information showing 1) there has been widespread giant sequoia seedling germination, seedling and sapling recruitment and survival within high-intensity fire areas targeted for logging, tree removal; and b) there has been presence, occupancy, and substantial utilization of habitats by California spotted owl, California condor, and Fisher, within early seral habitat created by higher-intensity fire patches that are targeted for logging, where the Projects' environmental review documents, and authorizing decision notices, had assumed that little or no such presence, occurrence, or utilization would occur.

93. Further, with respect to the Giant Sequoia National Monument Plan and the Giant Sequoia National Forest Plan, an agency may tier to a programmatic impact statement within five (5) years "unless there are substantial new circumstances or information about the significance of adverse effect that bear on the analysis," (42 U.S.C. § 4336b(1)). However, NEPA requires agencies to conduct supplemental analysis after five (5) years for programmatic impact statements and environmental assessments, which has not occurred. 42 U.S.C. 4336b(2). Instead the Forest Service has tiered its Project reviews to the older programmatic impact statements despite the significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. New

information regarding vigorous giant sequoia regeneration in high-intensity fire areas, and active use by Listed species of high-intensity fire areas, renders the 2012 Monument Plan and its analyses and assumptions stale, outdated, and invalid.

94. The Forest Service has made substantial changes in its authorized actions that are relevant to environmental concerns and that bear on the significance of environmental impacts. These changes put Forest Service in contravention of the Forest Plan and Monument Plan Standards and Guidelines, further nullifying the agency's reliance on the programmatic environmental review attending the Forest and Monument Plans.

95. Ongoing implementation of the Projects may have a significant impact on the environment but the Forest Service Defendants have not considered, analyzed, nor disclosed the effects of those decisions in a proper NEPA analysis.

96. The Forest Service's violations of NEPA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the Starvation Creek Grove Finding of No Extraordinary Circumstances and decision notice. and the Castle Project and Windy Project EAs, FONSIs, and DNs, and the Monument Plan EIS and Record of Decision, must be held unlawful, vacated, and set aside under 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**Violations of NFMA and APA (Inconsistency with Plan Requirements)**

97. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

98. The Forest Service Defendants violated the National Forest Management Act, 16 U.S.C. § 1601 et seq., and NFMA's implementing regulations by issuing ongoing activities that are not consistent with the applicable Giant Sequoia National Monument Plan and Sequoia National Forest Management Plan. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

99. Under NFMA's "consistency" requirement, all agency actions, including site-specific management activities, must be consistent with the governing Forest or Management Plan. 16 U.S.C. § 1604(I).

100. The Forest Service has failed to comply with Monument Plan Strategy 6 within the Starvation Creek Grove and Deer Creek Grove by failing to protect California condor roosting and foraging, and potential nesting areas, despite being on notice of the significant Condor use within the three project areas after the wildfires. Project activities within the groves violate the Plan's Monument-wide Wildlife Habitat Wildlife and Plant Habitat Standards and Guidelines.

101. The Forest Service's implementation of the Projects violates Monument Plan Monument-wide Wildlife Habitat Wildlife and Plant Habitat Standards and Guidelines including those governing California Spotted Owl PACs and HRCAs because the Forest Service has allowed activities without properly monitoring and designating PACs and without restricting activities in proximity to PACs and nest sites during limited operating periods.

102. Forest Service implementation of the Projects violates Monument Plan Monument-wide Wildlife Habitat Wildlife and Plant Habitat Standards and Guidelines governing Southern Sierra Fisher Conservation Area (SSFCA)/Furbearer Den Sites. In addition the Projects violate Monument Plan WL-17 by not adopting and implementing mitigation measures to

avoid fragmentation of Fisher habitat by ensuring the retention of sufficient shrub and standing dead tree cover to avoid "bottlenecks in habitat connectivity" in burned areas.

103. The Giant Sequoia National Monument Proclamation prohibits removal of Giant sequoias unless "clearly needed." Because the significant killing and removal of giant sequoia seedlings, saplings, and trees within the Freeman Creek Grove was not contemplated by the Castle Project EA, and in fact was prohibited by the Castle Project Decision Notice, such prior and ongoing removal is not "clearly needed" and each project activity destroying and killing natural regeneration of giant sequoias violates the Giant Sequoia National Monument Management Plan, the Monument Plan's Part-3 Design Criteria standards for finding of clear need, and the Plan's Monument-wide Vegetation Standards and Guidelines, as well as its Giant Sequoia Groves Vegetation Standards and Guidelines.

104. The Forest Service Defendants' violations of NFMA are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA; and accordingly the DNs must be held unlawful, vacated, and set aside under 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**(Violations of the Endangered Species Act and APA)**

105. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

106. This third claim for relief challenges the Forest Service's No Effect determinations for California condor and the ESA informal consultations and agencies' calls and concurrences concerning the Projects' likely effects to Fisher as being arbitrary, capricious, and not in

accordance with the law. This claim seeks judicial review of final agency actions taken pursuant to the ESA, and is brought pursuant to the judicial review provisions of the ESA and pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

107. Section 7 of the ESA requires that a federal agency seeking to conduct an action that it authorizes, funds or carries out must ensure that the action does not "jeopardize" ESA-listed species or their critical habitat; and the federal "action" agency must fulfill this duty by conducting consultation with the FWS and/or NOAA Fisheries, pursuant to ESA Section 7(a)(2) and implementing regulations. 16 U.S.C. § 1536(a)(2).

108. ESA Section 7 requires further that such consultation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

109. Reinitiation of consultation is required if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered. See 50 C.F.R. § 402.16.

110. Plaintiffs have complied with all procedural requirements to bringing a claim under the Endangered Species Act, including but not limited to serving the Defendants and all required government representatives with notice on or before July 23, 2026 of Plaintiffs' intent to sue not less than sixty (60) days prior to bring suit.

111. The Forest Service's "no effect" determinations in its review of the Projects' effects to California condor failed to rely upon best information and science and relied upon material assumptions that have since been discredited by the new and best information that condors are actively utilizing the Project areas.

112. The Defendants' programmatic Biological Opinion(s) relied upon in, and governing, the Monument Plan, the Sequoia National Forest Plan, and/or the Projects fails to rely upon best information and science concerning California condor, Fisher, and California spotted owl. The consultation and review relied upon material assumptions that have since been discredited by new and best information.

113. Further, the Forest Service's "no effect" determinations in its review of the Projects unlawfully relied upon nonbinding mitigation measures, including measures that have not been implemented nor enforced by the Forest Service.

114. The Forest Service's BAs attending each of the projects, provided to the U.S. FWS during the informal ESA consultations attending the Projects, were not based on the best scientific and commercial data available concerning Fisher. The FWS's concurrences were likewise not based on the best scientific and commercial information available.

115. Plaintiffs put Defendants on not less than 60-days' notice that new information has revealed the effects of Forest Service's actions, including ongoing implementation of the Projects, that may affect Listed species or critical habitat in a manner or to an extent not previously considered. Both the U.S. Forest Service and the US Fish and Wildlife Service have failed to initiate and reinitiate consultation despite being on notice of the new information, circumstances, and violations of the ESA.

116. Defendants have violated, and are continuing to violate Section 7 of the Endangered Species Act regarding impacts to California condors and Fisher.

*

## FOURTH CLAIM FOR RELIEF
## Violation of the Administrative Procedure Act

117. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

118. The Forest Service's actions as described above were arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706.

119. The US Fish and Wildlife Service's violations of law as alleged herein are arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority or limitations within the meaning of the judicial review provisions of the APA.

120. Accordingly, the Findings of Applicability and No Extraordinary Circumstances and decision notices regarding the Starvation Creek Grove Project, and the FONSIs and Decision Notices authorizing the Castle Project and Windy Project activities, and the EIS and Record of Decision authorizing the 2012 Monument Plan, must be held unlawful, vacated, and set aside under 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. Under the First Claim for Relief declare that the Starvation Creek Grove Project's Finding of No Extraordinary Circumstances, and the Castle Project and Windy Project EAs, FONSIs, the projects' Decision Notices, the Monument Plan EIS and Record of Decision, and the Forest Service decisions not to supplement the projects' or Plan's environmental

reviews are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA and the APA;

2. Under the Second Claim for Relief declare that the Forest Service has violated NFMA and the APA by authorizing project activities that violate forest plan management plan and national monument management plan standards established to protect giant sequoias, California spotted owl, California condor, and Fisher.

3. Under the Third Claim for Relief enter declaratory relief holding that the Forest Service's 'No Effect' determination regarding California condor, the Forest Service Starvation Creek Grove, Windy, and Castle Project BAs and/or the US Fish and Wildlife Service's Letters of Concurrence regarding Condor and Fisher are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law under the ESA and APA;

4. Set aside and vacate the Forest Service's environmental reviews and decision documents authorizing the Starvation Creek Grove Project, the Castle Project, and the Windy Project, and the Monument Plan;

5. Enter such other temporary restraining orders(s) and preliminary and permanent injunctive relief enjoining Defendant from implementation of project activities as necessary to prevent and remedy ongoing material and procedural harm and injury to Plaintiffs and the environment, and as hereafter prayed for by Plaintiffs;

6. Order the Forest Service and US Fish and Wildlife Service to reinitiate programmatic consultation informing and governing the Sequoia National Forest Management Plan and

the Giant Sequoia National Monument Management Plan considering the best information and science for listed California condor and Fisher;

7. Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to 28 U.S.C. § 2412 et seq., the ESA, and all other applicable authorities; and

8. Grant such other relief as the Court deems necessary and proper.

Dated: September 23, 2026.

Respectfully submitted,

/s/Michael Graf
Michael Graf (SBN 136172)
Law Offices
227 Behrens St.
El Cerrito CA 94530
Tel: (510) 525-1208
mwgraf@aol.com

/s/Brian A. Ertz
Brian A. Ertz, *applicant pro hac vice*
Ertz Law, PLLC
380 S. 4th Street, Ste. 104
Boise ID 83687
Tel: (208) 918-1663
brian@ertzlaw.org